# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FATEEM L. JACKSON,<br><br>        Plaintiff,<br><br>    v.<br><br>CDCR EMPLOYEES, et al.,<br><br>        Defendants.<br>_____ / | CASE NO. 1:07-cv-01414-LJO-SKO PC<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BE GRANTED ON QUALIFIED IMMUNITY GROUNDS, AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT BE DENIED AS MOOT<br><br>(Docs. 52 and 56)<br><br>THIRTY-DAY OBJECTION DEADLINE |

**Findings and Recommendations**

I.  **Procedural History**

Plaintiff Fateem L. Jackson, a state prisoner proceeding pro se and in forma pauperis, filed this civil rights action pursuant to 42 U.S.C. § 1983 on September 27, 2007. This action for damages is proceeding on Plaintiff's amended complaint, filed on June 24, 2008, against Defendants Selbach, Rubin, Ortiz, Payan, Pantoja, Wood, Yoder, Fernandez, Carrasco, and Zanchi on Plaintiff's Fourth and Fourteenth Amendment claims arising out of cross-gender strip searches at California Correctional Institution (CCI) in Tehachapi, California.

On April 18, 2011, Plaintiff filed a motion for summary judgment. After obtaining an extension of time, Defendants Selbach, Rubin, Payan, Pantoja, Wood, Yoder, Carrasco, and Zanchi (Defendants) filed an opposition and a cross-motion for summary judgment.[1] Briefing has been

---

[1] The United States Marshal was unable to locate and serve Defendants Ortiz and Fernandez.

1

completed and the cross-motions for summary judgment are ready for consideration. Local Rule 230(l).

## II. Legal Standard

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mutual Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). While the Court *may* consider other materials in the record not cited to by the parties, it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).

In resolving cross-motions for summary judgment, the Court must consider each party's evidence. Johnson v. Poway Unified School Dist., 658 F.3d 954, 960 (9th Cir. 2011). Plaintiff bears the burden of proof at trial, and to prevail on summary judgment, he must affirmatively demonstrate that no reasonable trier of fact could find other than for him. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case. In re Oracle Corp. Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, Soremekun, 509 F.3d at 984 (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).

**III.    Undisputed Facts[2]**

    **A.    Factors Leading to the Implementation of the Strip Search Policy**

Plaintiff is an inmate in the custody of the California Department of Corrections and Rehabilitation and he was incarcerated at CCI from January 29, 2004, to August 30, 2007. While at CCI, Plaintiff was housed in Facility IVA, a maximum security general population yard. All inmates housed in Facility IVA, including Plaintiff, were classified as Level IV inmates, which is the highest security classification within the California prison system.

The following documented incidents occurred on Facility IVA at CCI. On July 5, 2005, a correctional officer was assaulted by an inmate. On November 29, 2005, an inmate was the victim of a stabbing by another inmate. On December 14, 2005, two inmates assaulted two correctional officers. On December 28, 2005, a plan was revealed by an anonymous informant that a major prison gang was planning to assault correctional staff. On February 11, 2006, four inmates assaulted three correctional officers. On October 7, 2006, an inmate attempted to murder a correctional officer with an inmate-manufactured stabbing weapon in the dining hall during yard release. On November 26, 2006, an anonymous note was discovered with a list of inmates and correctional officers targeted for an assault by a major prison gang. On December 5, 2006, an inmate was attacked by another inmate with a concealed weapon. On May 21, 2007, another anonymous note was discovered that identified several members of a major prison gang planning an assault on correctional officers. On June 19, 2007, a search of the library revealed numerous concealed weapons. Finally, on April 3, 2008, two inmates attempted to murder two correctional sergeants and one correctional officer in the IVA Unit Office using stabbing weapons.

Prior to October 2006, the inmates in CCI's Facility IVA were routinely searched in their boxer shorts and socks. These searches failed to prevent inmates from moving weapons out of their cells to various parts of the facility. After a number of violent incidents involving inmate manufactured weapons, including the attempted murder of a correctional officer in October 2006, it became known that Facility IVA inmates were hiding weapons in the lining of their boxer briefs

---

[2] All of the undisputed facts relevant to the parties' cross-motions for summary judgment are included in this section.

3

or other clothing items, necessitating the unclothed body searches to prevent the movement of weapons and the ongoing violent attacks at Facility IVA. Because of the ongoing serious incidents of violence in Facility IVA, the ongoing presence of inmate-manufactured weapons discovered in the facility, and the heightened concern toward preventing the movement of weapons in that facility, in approximately October 2006, CCI implemented unclothed body searches for Facility IVA inmates entering and exiting the housing unit. These searches were the only practical means of preventing inmates from concealing weapons and other contraband inside and beneath their underwear and other clothing items. Metal detectors were an insufficient means of inspection as many prison weapons are made out of non-detectable substances such as plastic.

### B. Description of Strip Searches

The unclothed body searches did not involve staff touching inmates but they included visual body cavity searches, and they were conducted whenever inmates entered or exited the Facility IVA housing unit. As part of CCI's unclothed body search policy at Facility IVA, under normal circumstances, male correctional officers performed the visual inspection of the inmates' bodies to ensure the inmates were not concealing weapons or other contraband, and female officers assigned to that facility typically provided security coverage and alarm response, and inspected inmates' clothing items.

Officers conducting the searches were separated from the inmates by a dining room table. There were six tables in the dining hall and six inmates were searched at a time, one inmate per table. Two correctional officers staffed each table, and one or two correctional officers would provide defensive cover from positions above. At each table, one correctional officer would conduct the visual search of the inmate while the other correctional officer would inspect the inmate's clothing from several feet away.

The searches lasted approximately 30 to 45 seconds from the inmate's arrival at the search area until the search was completed and the inmate left the area, depending on the amount of clothing and personal items in the inmate's possession at the time of the search. During the unclothed body search, an officer would give the inmate directions, referred to here as search directives. Once nude, inmates were instructed to raise their hands; open their mouths and waggle their tongues; flap the

backs of their ears and hair; lift their genitals; turn around and lift their feet; bend over; and spread their buttocks, squat, and cough three times. (Amend. Comp., ¶28 n.8; Depo., 19:1-6.) In addition, some staff would instruct inmates with uncircumcised penises to pull the foreskin back. (Doc. 52, Jackson Dec., ¶5.)

### C. Staffing Issues

Facility IVA is staffed by both male and female correctional staff. There were approximately twenty (20) to twenty-five (25) officers present during the Facility IVA unclothed body searches. To prohibit female staff from participating in these body searches would inhibit the ability to provide security to inmates and staff on Facility IVA, and an attempt to reassign female staff to other posts would impose a significant hardship. Typically, there were not enough male correctional officers assigned to Facility IVA to perform all the necessary functions required during the body searches.

There were also serious concerns regarding violation of correctional staff's union rights if staff were not permitted to bid on and work particular posts due to their sex/gender. Under the collective bargaining agreement, correctional staff were permitted to bid on particular posts (assignment in a particular facility) based on their seniority. Thus, denying female correctional staff the opportunity to bid on and accept a post in Facility IVA would violate their rights under the collective bargaining agreement. Further, the California Department of Corrections and Rehabilitation and CCI are equal employment opportunity employers, giving rise to concerns that the reassignment or removal of female correctional staff from their assigned posts based on their sex/gender might lead to noncompliance with the applicable laws regarding sex/gender discrimination.

### D. Specific Searches at Issue

Defendants Pantoja, Payan, Rubin, Selbach, Wood, and Yoder were female correctional officers at CCI during the relevant time period, and they were present for or involved in the unclothed body searches at issue on one or more occasions between May 20, 2007, and August 30, 2007, as described below. They did not play any role in the decision to implement the unclothed

///

body search policy at CCI. Neither Defendant Zanchi nor Defendant Carrasco was present during any of the unclothed body searches, but they held supervisory positions at CCI.

On May 20, 2007, Defendants Pantoja and Wood were present during an unclothed body search of inmates during yard recall. (Amend. Comp., ¶28; Depo., 36:2-38:1, 52:7-20; Jackson Dec., ¶10.) Defendants Pantoja and Wood were approximately two to four feet away from Plaintiff, searching other inmates' clothing at the table next to Plaintiff, while a male officer was giving the search directives. (Amend. Comp., ¶28; Depo., 36:2-38:1, 52:7-20; Jackson Dec., ¶10.) During the search, Defendant Selbach, who was armed, was in the building 3 gun tower no more than approximately fifteen feet away, directly observing the searches. (Amend. Comp., ¶28; Depo., 26:14-27:5, 48:13-49:9; Jackson Dec., ¶10.)

On June 27, 2007, Defendant Yoder was searching clothing at the table next to Plaintiff's table, approximately three feet away, and Defendant Selbach was directly observing the search from the gun tower.[3] (Amend. Comp., ¶30; Depo., 48:19-22, 53:7-54:12; Jackson Dec., ¶11.)

On July 2, 2007, Defendant Zanchi issued a memorandum directing custody staff to conduct unclothed body searches on inmates leaving for and returning from their educational and work assignments.[4] (Amend. Comp., ¶¶32-34; Depo., 34:6-24; Jackson Dec., ¶12.)

On July 17, 2007, Plaintiff sought counseling/therapy from the institutional clinical psychologist for the anxiety he experienced as a result of the strip searches.[5] (Amend. Comp., ¶40; Depo., 61:17-6; Jackson Dec., ¶15.)

---

[3] Defendants' objection to this fact is misdirected. The fact describes Defendant Selbach's conduct on June 27, 2007, not Defendant Payan's conduct on July 25, 2007, or on July 27, 2007, which is what Defendants purport to dispute.

[4] Although Defendants object to this fact on the ground it is inadmissible hearsay, an opposing party's statement is not hearsay, Fed. R. Evid. 801(d)(2)(A), and Defendants offer no evidence bringing the fact into dispute. However, while Plaintiff asserts that the memo authorized female custody staff to conduct strip searches, the evidence Plaintiff relies upon does not support a finding that the memo directed or specifically authorized female officers to strip search inmates. Rather, the memo authorized or ordered custody staff to strip search inmates going to and returning from their educational and work assignments, and the undisputed fact is worded accordingly. (Jackson Dec., ¶12; Zanchi ROGs 19, 20.)

[5] Defendants object to this fact on the ground that it calls for an expert opinion, but Plaintiff is competent to testify that he sought out counseling or therapy from the prison's clinical psychologist for stress he experienced as a result of the searches. The proffered fact is confined to how Plaintiff felt and what action he took as a result, and it is not based on any scientific, technical, or other specialized knowledge. Fed. R. Evid. 701, 702.

6

On July 24, 2007, Defendant Selbach gave Plaintiff the search directives and searched his clothing while two male officers jeered and chuckled at Plaintiff and other inmates.[6] (Amend. Comp., ¶41; Depo., 22:8-23:14, 49:11-18; Jackson Dec., ¶16.)

On July 25, 2007, Defendant Rubin gave Plaintiff the strip search directives, which included pulling back the foreskin of his penis, and searched his clothing.[7] (Amend. Comp., ¶42; Depo., 39:21-40:19; Jackson Dec., ¶17.) No other officers were present at the table with Defendant Rubin, although there were other officers in the general area providing coverage. (Amend. Comp., ¶42; Depo., 39:21-40:19; Jackson Dec., ¶17.)

On August 1, 2007, Defendant Selbach was positioned in the gun tower, observing the searches. (Amend. Comp., ¶44; Depo., 50:5-14; Jackson Dec., ¶19.)

On August 22, 2007, Defendant Payan gave Plaintiff the strip search directives while a male officer searched his clothing. (Amend. Comp., ¶46; Depo., 40:20-41:8; Jackson Dec., ¶20.)

On August 24, 2007, Defendant Rubin was stationed in the gun tower during yard recall and release, directly observing the searches.[8] (Amend. Comp., ¶47; Jackson Dec., ¶21.)

///

---

[6] Although Defendants object to the inclusion of the male officers as irrelevant, neither the atmosphere during a search nor the possible availability of male officers to assist is irrelevant to a Fourth Amendment claim.

[7] Defendants dispute that Defendant Rubin directly searched Plaintiff or any other inmate, but they submit no evidence bringing Plaintiff's version of the events on July 15, 2007, into question.

[8] Defendants object to this fact on the ground that during his deposition, Plaintiff attested that Defendant Rubin was present for only one search, on July 25, 2007. (Depo., 45:25-46:8.) However, Plaintiff identified the incident in both his amended complaint, which preceded the deposition, and in his declaration, which was subsequent to his deposition. He also explained the discrepancy in his declaration submitted in response to his opposition. (Doc. 61, Opp., Jackson Dec., ¶24.)
Nothing in the record provides any basis to find that Plaintiff attempted to create a disputed issue of fact through a sham declaration issued after his deposition. Van Asdale v. Int'l Game Technology, 577 F.3d 989, 998 (9th Cir. 2009) (the sham affidavit rule is in tension with the principle that on summary judgment, courts may not determine credibility or weigh evidence, and therefore, the rule must be applied with caution and courts must make a factual determination that the contradiction was actually a sham) (quotation marks and citations omitted); see also Adler v. Federal Republic of Nigeria, 107 F.3d 720, 728 (9th Cir. 1997) (courts not required to disregard contradictory affidavits). Notably, the allegation against Defendant Rubin was initially present in Plaintiff's verified amended complaint and nothing precluded Defendants from more specifically inquiring into it or into any inconsistency while deposing Plaintiff. Defendants' objection is overruled.
  As with the other searches in question, Defendants submit no evidence that Defendant Rubin was not stationed in the guard tower on August 24, 2007, as Plaintiff alleges. Therefore, the Court accepts as undisputed Plaintiff's evidence that Defendant Rubin was on duty in the guard tower on that date.

7

Finally, on August 29, 2007, Defendant Selbach gave Plaintiff the search directives and searched his clothing while Defendant Payan was searching inmates' clothes two tables away. (Amend. Comp., ¶48; Depo., 43:11-24, 47:13-22, 50:15-20; Jackson Dec., ¶¶22, 23.)

On August 30, 2007, Plaintiff was transferred from CCI to Centinela State Prison. (Amend. Comp., ¶49; Depo., 5:22-24.)

## IV.     Discussion

### A.     Fourteenth Amendment Claim

In its screening order, issued prior to the transfer of this case to the undersigned, the Court framed Plaintiff's claims as seeking relief for violation of the Fourth Amendment's prohibition on unreasonable searches and the Fourteenth Amendment's right to privacy. In his amended complaint, Plaintiff alleges a Fourth Amendment privacy claim and a Fourteenth Amendment substantive due process claim. (Amend. Comp., 20:3-4 & 21:26-28.) In his deposition testimony and in moving for summary judgment, Plaintiff reiterates those bases for his claims. (Depo., 33:10-14; Motion, p. 1.) Accordingly, the Court treats Plaintiff's Fourteenth Amendment claim as brought for violation of the substantive component of the Due Process Clause, while Plaintiff's challenge to the reasonableness of the searches and to the invasion of his right to bodily privacy is brought under the Fourth Amendment.

The touchstone of due process is protection of the individual against arbitrary government action, whether the fault lies in a denial of fundamental procedural fairness or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective. County of Sacramento v. Lewis, 523 U.S. 833, 845-46, 118 S.Ct. 1708 (1998) (quotation marks and citations omitted). The concept of substantive due process is expanded only reluctantly and therefore, if a constitutional claim is covered by a specific constitutional provision, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process. County of Sacramento, 523 U.S. at 843 (quotation marks and citation omitted).

///

Plaintiff's legal claims arise from the same set of facts, which involves strip searches conducted in the presence of, and on occasion by, female correctional officers. The Fourth Amendment protects Plaintiff from unreasonable searches and in analyzing the reasonableness of Fourth Amendment searches, the Ninth Circuit recently again recognized as longstanding "the desire to shield one's unclothed figure from the view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity." Byrd v. Maricopa Cnty. Sheriff's Dep't, 629 F.3d 1135, 1140 (9th Cir. 2011) (en banc), *cert. denied*, 131 S.Ct. 2964 (2011) (citing York v. Story, 324 F.2d 450, 455 (9th Cir. 1963)) (internal quotation marks omitted). Because Plaintiff's claim that the cross-gender strip searches violated his constitutional rights is covered by the Fourth Amendment specifically, Plaintiff may not also pursue a substantive due process claim. County of Sacramento, 523 U.S. at 843. Therefore, pursuant to 28 U.S.C. § 1915A, the Court recommends that Plaintiff's substantive due process claim be dismissed, with prejudice, on the ground that it fails to state a claim as a matter of law. County of Sacramento, 523 U.S. at 843.

    **B.**    **Fourth Amendment Claim**

Plaintiff and Defendants filed cross-motions for summary judgment seeking judgment as a matter of law on the merits of Plaintiff's Fourth Amendment claim. In addition, Defendants seek a determination that they are entitled to qualified immunity.

    **1.**    **Reasonableness Test**

The Fourth Amendment prohibits only unreasonable searches. Bell v. Wolfish, 441 U.S. 520, 558, 99 S.Ct. 1861 (1979); Byrd, 629 F.3d at 1140; Michenfelder v. Sumner, 860 F.2d 328, 332 (9th Cir. 1988). The reasonableness of the search is determined by the context, which requires a balancing of the need for the particular search against the invasion of personal rights the search entails. Bell, 441 U.S. at 558-59 (quotations omitted); Byrd, 629 F.3d at 1141; Bull v. City and Cnty. of San Francisco, 595 F.3d 964, 974-75 (9th Cir. 2010); Nunez v. Duncan, 591 F.3d 1217, 1227 (9th Cir. 2010); Michenfelder, 860 F.2d at 332-34. Factors that must be evaluated are the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. Bell, 441 U.S. at 559 (quotations omitted); Byrd, 629 F.3d

at 1141; Bull, 595 F.3d at 972; Nunez, 591 F.3d at 1227; Michenfelder, 860 F.2d at 332. In analyzing these factors, the cross-gender nature of the search is a critical consideration. Byrd, 629 F.3d at 1143.

Here, Plaintiff challenges not the general strip search policy initiated in 2006 or the reasonableness of the strip searches if conducted by a male officer. Rather, Plaintiff challenges the cross-gender nature of the routine, non-emergency strip searches when conducted by female officers or in the presence of female officers, in violation of his right to bodily privacy.

### 2. Qualified Immunity Issue

Qualified immunity is "immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Mueller v. Auker, 576 F.3d 979, 993 (9th Cir. 2009) (citation and internal quotations omitted). As a result, the Court elects to first determine whether Defendants are entitled to qualified immunity. If they are not, the Court will then consider the parties' cross-motions on the merits of Plaintiff's Fourth Amendment claim.

#### a. Two-Part Inquiry

Qualified immunity shields government officials from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982). "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808 (2009), and it protects "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092 (1986).

In resolving a claim of qualified immunity, courts must determine whether, taken in the light most favorable to the plaintiff, the defendant's conduct violated a constitutional right, and if so, whether the right was clearly established. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151 (2001); Mueller, 576 F.3d at 993. While often beneficial to address in that order, courts have

discretion to address the two-step inquiry in the order they deem most suitable under the circumstances. Pearson, 555 U.S. at 236 (overruling holding in Saucier that the two-step inquiry must be conducted in that order, and the second step is reached only if the court first finds a constitutional violation); Mueller, 576 F.3d at 993-94. In this instance, the Court elects to proceed directly to the second step of the inquiry and determine whether Plaintiff's Fourth Amendment right to be free from strip searches conducted by and/or viewed by female officers was clearly established in 2007. Phillips v. Hust, 588 F.3d 652, 655 (9th Cir. 2009) (courts have the discretion to proceed directly to the qualified immunity question); Somers v. Thurman, 109 F.3d 614, 622 (9th Cir. 1997) (declining to determine whether Fourth Amendment right to be free from cross-gender strip searches existed because there was no question it was not clearly established).

### b.  Clearly Established Right

"For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 2515 (2002). While the reasonableness inquiry may not be undertaken as a broad, general proposition, neither is official action entitled to protection "unless the very action in question has previously been held unlawful." Hope, 536 U.S. at 739. "Specificity only requires that the unlawfulness be apparent under preexisting law," Clement v. Gomez, 298 F.3d 898, 906 (9th Cir. 2002) (citation omitted), and prison personnel "can still be on notice that their conduct violates established law even in novel factual circumstances," Hope, 536 U.S. at 741. The salient question is whether the state of the law in 2007 gave Defendants fair warning that they were not permitted, in non-emergencies, to conduct cross-gender strip searches or to be present during cross-gender strip searches. Hope, 536 U.S. at 741 (quotation marks omitted).

In 1985, the Ninth Circuit considered the claim by male inmates that female officers were viewing them partially or totally nude while dressing, showering, being strip searched, or using the toilet, in violation of their right to privacy. Grummett v. Rushen, 779 F.2d 491, 492 (9th Cir. 1985). Relying on its decision in York v. Story, 324 F.2d 450 (9th Cir. 1964), in which it recognized a right to bodily privacy implicit in the Due Process Clause of the Fourteenth Amendment, the Ninth Circuit

assumed an interest in shielding one's body from members of the opposite sex, protected by the right of privacy. Grummett, 779 F.2d at 494. In finding no Fourth or Fourteenth Amendment violation and affirming the district court's decision granting summary judgment for prison officials, the Ninth Circuit discussed the circumstances in which female officers were observing male inmates. Id. at 494-96. Female officers were not assigned to positions requiring unrestricted and frequent surveillance and instead, they were in positions requiring only infrequent and casual observation, or observation from a distance. Id. at 494 (quotation marks omitted). Female officers did not conduct or observe strip or body cavity searches, with the exception of two or three emergency situations, and the pat-down searches they conducted did not involve intimate contact with inmates' bodies and were handled professionally. Id. at 495 (quotation marks omitted).

In 1988, the Ninth Circuit considered a challenge to frequent, routine strip searches on the grounds that they were unreasonable and that they violated inmates' right to privacy because they were conducted within the view of female officers. Michenfelder, 860 F.2d at 333. In addition, the plaintiff challenged the stationing of female officers on shower duty. Id. In Michenfelder, the visual body cavity searches at issue took place in the maximum security unit and were conducted every time an inmate left or returned to the unit. Id. at 332. Female officers did not conduct strip searches except in emergencies and they were not routinely present for the searches, but they were stationed in positions controlling cell doors and monitoring the tiers via video screen. Id. at 330. For those controlling cell doors, the searches were visible through a small window; and in the event that female officers monitoring the tiers violated prison policy and closely watched the searches, they would at most have an indistinct, limited view via the video monitors. Id. at 330, 334. The Ninth Circuit also found that "[e]vidence of female officers' role in shower duty likewise did not establish an inappropriate amount of contact with disrobed prisoners." Id. at 334.

In Michenfelder, the Ninth Circuit recognized "that incarcerated prisoners retain a limited right to bodily privacy," but found that the searches were reasonable and neither the searches nor the employment of female guards on shower duty violated inmates' right to privacy. Id. at 333-34. It found that the prison's division of responsibilities between male and female guards represented a

reasonable attempt to accommodate the tension between inmates' privacy concerns and the prison's internal security needs and equal employment concerns. Id. at 334.

In 1992, the Ninth Circuit considered a female parolee's claim that a male parole officer violated her right to bodily privacy by entering the bathroom stall and observing her provide a urine sample while she was partially nude and seated on the toilet. Sepulveda v. Ramirez, 967 F.2d 1413, 1415 (9th Cir. 1992). The Ninth Circuit found that the officer was not entitled to qualified immunity because the female parolee's right to bodily privacy was clearly established by 1988. Sepulveda, 967 F.2d at 1415-16.

Then, in 1997, the Ninth Circuit considered a Fourth Amendment claim arising out of cross-gender strip searches in which, as here, female officers directly participated. Somers, 109 F.3d at 616. In Somers, a male inmate alleged that female officers were regularly subjecting him to non-emergency visual body cavity searches, in contravention of prison regulations, which permitted cross-gender unclothed body inspections only in emergency conditions. Id. Further, the female officers pointed at the plaintiff and made jokes amongst themselves. Id.

The district court found that the female officers violated the inmate's clearly established constitutional rights and the court denied them qualified immunity. Id. Although the Ninth Circuit acknowledged its earlier decisions in Grummett, Michehfelder, and Sepulveda might be read to suggest that up close, frequent, and intentional viewing of male prisoners by female officers could violate an inmate's privacy rights, it reversed the district court and granted the officers qualified immunity. Id. at 620 (quotation marks omitted). The Ninth Circuit cited the different direction taken in Jordan v. Gardner, in which an en banc panel of the Ninth Circuit stated that while inmates may have protected privacy interests in freedom from cross-gender strip searches, such interests had not been judicially recognized and inmates' legitimate expectations of bodily privacy from persons of the opposite sex were extremely limited.[9] Id. at 620 (citing Jordan v. Gardner, 986 F.2d 1521, 1524-25 (9th Cir. 1993) (en banc)) (quotation marks omitted).

---

[9] In Jordan, the Ninth Circuit did not ultimately reach the female inmates' Fourth Amendment claims because it found the cross-gender searches by male officers violated the Eighth Amendment, but in discussing the Fourth Amendment, it declined to assume that because the searches caused immense anguish, they necessarily violated the Fourth Amendment. Jordan, 986 F.2d at 1524-25.

13

Relying on the Jordan decision, the Ninth Circuit held in Somers that the female officers were entitled to qualified immunity because in 1993 when the conduct occurred, male inmates did not have a clearly established Fourth Amendment privacy interest prohibiting cross-gender strip searches. Id. The Ninth Circuit further stated that even in 1997, it was highly questionable whether inmates had a Fourth Amendment right to be free from routine cross-gender unclothed searches or from being viewed unclothed by officers of the opposite sex. Id. at 622.

It bears repeating that "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgment about open legal questions." Ashcroft v. al-Kidd, __ U.S. __, __, 131 S.Ct. 2074, 2085 (2011). "It is thoroughly inconsistent with the rationale underlying the doctrine of qualified immunity to hold individuals personally liable for conduct not previously clearly identified as unlawful," and "government officials are not required to anticipate subsequent legal developments." Somers, 109 F.3d at 621. "Government officials cannot fairly be said to know the law unless it is sufficiently unmistakable from authoritative sources," and "[i]t is not even enough to demonstrate that the constitutional norm relied on is the logical extension of principles and decisions already in the books." Id. at 621-22 (citations omitted).

The Ninth Circuit's most recent decision in Byrd represents a sharp departure from Somers, and reasonable government officials will be wise to note that departure.[10] In as much as the Ninth Circuit has now held that non-emergency cross-gender strip searches are unconstitutional as a matter of law, it is perhaps only the unwise who will continue to risk participating in or permitting the practice of routine, non-emergency, cross-gender strip searches, regardless of prison staffing concerns, including equal employment opportunity concerns.[11]

Nevertheless, the Byrd decision was issued in 2011. In 2007, at the time of the events at issue here, Somers was controlling and directly on point with respect to routine body cavity searches

---

[10] Inexplicably, Defendants failed to acknowledge the Byrd decision in their cross-motion for summary judgment, which was filed approximately six months after the decision issued.

[11] While the Byrd decision may be limited to its facts, the cross-gender search at issue was a one-time event and there was no evidence that the officers ridiculed or otherwise abused the inmates. Byrd, 629 F.3d at 1143-47. Also, although the inmates were wearing boxer shorts, the Ninth Circuit nonetheless found the search to be a strip search. Id. at 1142. These factors suggest it may be a difficult task to distinguish Byrd from other routine, non-emergency cross-gender strip searches. Id. at 1146-47.

14

of male inmates by female officers. The Court finds that in 2007, the pre-existing law did not give Defendants fair warning that it was unlawful to occasionally conduct routine cross-gender strip searches and it necessarily follows that it was not clearly established that the less direct participation of searching inmates' clothing and providing security coverage from the gun tower during these searches was unconstitutional.[12]

Accordingly, the Court finds that Defendants are entitled to qualified immunity on Plaintiff's Fourth Amendment claim against them. As a result of this finding, the Court recommends that Plaintiff's motion for summary judgment on the merits be denied.

## V.     Recommendation

For the reasons set forth above, the Court HEREBY RECOMMENDS that:

1. Plaintiff's substantive due process claim be dismissed, with prejudice, on the ground that it fails to state a claim as a matter of law;

2. Defendants' motion for summary judgment, filed on July 16, 2011, be GRANTED on the ground of qualified immunity and otherwise DENIED as moot; and

3. Plaintiff's motion for summary judgment, filed on April 18, 2011, be DENIED as moot in light of the finding that Defendants are entitled to qualified immunity.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the

///
///
///

---

[12] Although Plaintiff argues that Defendants' conduct violated prison regulations, that argument was also made, unsuccessfully, in Somers. State officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violated state regulations. Davis v. Scherer, 468 U.S. 183, 194, 104 S.Ct. 3012 (1984); Cousins v. Lockyer, 568 F.3d 1063, 1070 (9th Cir. 2009); Somers, 109 F.3d at 621; Doe v. Petaluma City School Dist., 54 F.3d 1447, 1452 (9th Cir. 1995).

specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:    February 9, 2012**                    /s/ Sheila K. Oberto
UNITED STATES MAGISTRATE JUDGE